Walter T. PETERS, Jr.

v.

**DELAWARE RIVER PORT AUTHORITY OF PENNSYLVANIA AND NEW JERSEY, Appellant.**

Nos. 92–2101, 93–1278.

United States Court of Appeals, Third Circuit.

Argued Oct. 5, 1993.

Decided Jan. 20, 1994.

Sur Petition for Rehearing Feb. 22, 1994.

John M. Elliott (argued), Mark J. Schwemler, Elliott, Vanaskie & Riley, Blue Bell, PA, for appellant DE River Port Authority of PA and NJ.

Thomas J. Duffy (argued), Duffy and Quinn, Philadelphia, PA, for appellee Walter T. Peters, Jr.

Before: HUTCHINSON, COWEN and NYGAARD, Circuit Judges.

**OPINION OF THE COURT**

COWEN, Circuit Judge.

Walter T. Peters ("Peters") filed a complaint alleging that the Delaware River Port Authority of Pennsylvania and New Jersey ("DRPA") violated his constitutional rights of freedom of belief and association by failing to reappoint him as its Secretary solely because he is a member of the New Jersey Republican Party. In a pretrial application, the district court ruled that the position of Secretary was not a politically sensitive position. Accordingly, the district court held that Peters' position as Secretary was protected by the First Amendment from termination by reason of his political affiliation. The case was thereafter tried to a jury, which rendered a verdict in favor of Peters. The ultimate question presented in this appeal is whether party affiliation is an appropriate requirement for the effective performance of the position of Secretary of the DRPA. Because we find that it is, we will reverse and direct the district court to enter judgment in favor of the DRPA.

I.

The DRPA is an agency of Pennsylvania and New Jersey, formed by a Compact (the "Compact") between these two states that was formally approved by Congress.[1] The DRPA was created, among other things, to operate and maintain the bridges owned jointly by Pennsylvania and New Jersey across the Delaware River and between the cities of Philadelphia and Camden. Under the Compact, the DRPA has the authority to construct and maintain facilities for the transportation of passengers, to improve and develop the Port District[2] for port purposes, and to promote commerce on the Delaware River. It may also establish, maintain, and operate a rapid transit system between certain points in New Jersey and Pennsylvania. Compact art. I.

The DRPA is governed by a sixteen-member Board of Commissioners, eight of whom are appointed by the Governor of New Jersey for periods of five years. Compact art. II. The Governor of Pennsylvania appoints six of the commissioners for five-year terms, with the elected Auditor General and the elected State Treasurer of Pennsylvania filling the remaining two positions for their four-year terms. Compact art. II. All commissioners, other than the Pennsylvania Au-

---

1. The Compact has been formally approved by the legislatures of both Pennsylvania and New Jersey. Pa. Stat. Ann. tit. 36, § 3503 (1961 & Supp.1993); N.J.Stat.Ann. §§ 32:3–1 to –18 (West 1990 & Supp.1993) [hereinafter the "Compact"]. Such a compact requires congressional approval. The Constitution provides: "No State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. The consent of Congress was originally given by Act of June 14, 1932, ch. 258, 47 Stat. 308. Congress consented to the most recent amendments to the Compact by Act of Oct. 27, 1992, 106 Stat. 3576.

2. The Port District includes "all the territory within the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia in Pennsylvania, and all the territory within the counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Ocean and Salem in New Jersey." Compact art. XIII.

ditor General and State Treasurer, continue to hold office after the expiration of their terms and until their successors are appointed and qualified. Compact art. II. The Board of Commissioners is empowered to elect various officers including a Secretary. Compact art. IV(d). The By-laws of the DRPA provide that the Board is to elect the Secretary for a two-year term.

Peters became an officer of the DRPA when the Board of Commissioners elected him as Secretary on October 20, 1989 to fill a vacancy. However, the Board did not reappoint him when his term ended in January, 1991. Peters, a New Jersey Republican, claims that he was not retained because the Board wanted the position for an individual affiliated with the New Jersey Democratic Party. The person who succeeded Peters as Secretary is a Democrat.

Peters brought this suit pursuant to 42 U.S.C. § 1983, alleging that the commissioners violated his constitutional rights by not reappointing him solely because of his political affiliation. The district court entered two orders which are the subject of this appeal. The DRPA moved for summary judgment, arguing that it was an arm or instrumentality of both the Commonwealth of Pennsylvania and the State of New Jersey and, therefore, not subject to suit under 42 U.S.C. § 1983. In its March 6, 1992 decision, the district court denied defendant's motion for summary judgment, holding that the DRPA was a "person" for purposes of 42 U.S.C. § 1983. *Peters v. Delaware River Port Auth. of Pa. and N.J.*, 785 F.Supp. 517, 518–21 (E.D.Pa. 1992).

In that same decision, the district court also addressed the DRPA's argument that it was entitled to summary judgment because the position of Secretary of the DRPA was a policymaking or confidential position, and party affiliation is a constitutionally acceptable requirement for the position. The district court initially determined that genuine issues of material fact existed, and denied defendant's motion. *Id.* at 521–22. At the

conclusion of discovery, the district court again entertained the question of whether party affiliation is a constitutionally acceptable requirement for the position of Secretary. In the second decision which we review in this appeal, the district court determined that the bi-state nature of the DRPA mandates that the function of the Secretary be carried out in a non-political manner. It denied defendant's motion for summary judgment and granted plaintiff's motion for partial summary judgment. *Peters v. Delaware River Port Auth. of Pa. and N.J.*, 809 F.Supp. 13, 15–18 (E.D.Pa.1992). The effect of the court's ruling was to foreclose the DRPA from taking into account political considerations when making personnel decisions regarding the office of Secretary. The case then proceeded to trial with the jury returning a verdict in favor of Peters. The district court had jurisdiction by virtue of 28 U.S.C. § 1331. We have jurisdiction over the appeal at No. 93–1278 pursuant to 28 U.S.C. § 1291.[3]

## II.

■ We apply the same standards as the district court when it considered the summary judgment motions. *Waldorf v. Shuta*, 896 F.2d 723, 728 (3d Cir.1990). Our review is plenary. *Id.* We must consider all of the facts and inferences in the light most favorable to the nonmoving party. *Waskovich v. Morgano*, 2 F.3d 1292, 1296 (3d Cir.1993). The moving party can prevail in its motion for summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Waldorf*, 896 F.2d at 728.

## III.

A. The DRPA's Amenability to Suit Under 42 U.S.C. § 1983

We first consider the contention of the DRPA that it is not amenable to suit under § 1983. In *Will v. Michigan Dep't of State*

---

**3.** The district court's grant of partial summary judgment appealed at No. 92–2101 did not end the litigation and left issues to be decided at trial. The order was therefore not a final order under 28 U.S.C. § 1291, and we find no other basis for appellate jurisdiction. Thus, we lack jurisdiction over the appeal at No. 92–2101 and it will be dismissed. We will, however, consider all of the issues raised at No. 92–2101 as part of our resolution of the appeal at No. 93–1278.

*Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that a state is not a "person" under 42 U.S.C. § 1983,[4] and is therefore not amenable to suit under that statute. *Id.* at 65–67, 70, 109 S.Ct. at 2309, 2311. The Court based this holding in part on the immunity to suit in federal court which the Eleventh Amendment provides to states. *Id.* The Court held that the rule that a state is not a person under § 1983 "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70, 109 S.Ct. at 2311. The DRPA argues that it is an arm of the state for Eleventh Amendment purposes, and is therefore not a "person" under § 1983.[5]

■ The district court determined that for purposes of the Eleventh Amendment the DRPA is not an arm of either Pennsylvania or New Jersey, and denied the DRPA's motion for summary judgment on this ground. 785 F.Supp. at 518–21. The district court's reasoning and conclusion concerning this issue is thorough and persuasive. We agree with that portion of the opinion of the district court concerning the DRPA's amenability to suit under § 1983.

■ We have previously set forth criteria to be considered in determining whether an entity is an alter ego of a state for Eleventh Amendment purposes. *Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807, 814–18 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989). We have condensed these criteria into three general factors: (1) whether, in the event plaintiff prevails, the payment of the judgment would come from the state (this includes three considerations: whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts); (2) the status of the agency under state law (this includes four factors: how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation); and (3) what degree of autonomy the agency has. *Bolden,* 953 F.2d at 816. The first of the three factors is the most important one. *Id.* at 816, 818.

1. *Funding.* The first factor, whether the source of payment for any judgment would come from either New Jersey or Pennsylvania, weighs heavily against finding that the DRPA is an alter ego of either New Jersey or Pennsylvania for purposes of the Eleventh Amendment. According to the Compact, the DRPA is financially self-sustaining, raising revenues by means of bonds, tolls and rent collections. Compact arts. IV(j), VIII. Moreover, the Compact specifi-

4. Section 1983 provides, in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.

5. While the Court in *Will* stated that the scope of the Eleventh Amendment is a consideration when interpreting § 1983, it pointed out that the scope of the Eleventh Amendment and the scope of § 1983 are separate issues. 491 U.S. at 66–67, 109 S.Ct. at 2309.
 In the matter presently before us, the DRPA's only grounds for contending that it is not a "person" are the arguments based on the Eleventh Amendment and *Will* that are discussed below. Therefore, we do not consider whether the DRPA's position that it is not a "person" under § 1983 is supported by any legislative history of that statute or by cases dealing with issues other than the Eleventh Amendment. In *Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992), the defendant, just as the DRPA here, claimed that it was not a "person" under § 1983. *Id.* at 821. We stated that when stripped of its Eleventh Amendment component, the argument that the defendant was not a "person" under § 1983 did not raise any question of federal jurisdiction unless the claim that the defendant was a " 'person' was made in bad faith or was 'wholly insubstantial and frivolous.' " *Id.* The instant action raises no such concerns.

cally provides that the DRPA has no power to pledge the credit or create any debt of either Pennsylvania or New Jersey. Compact art. VII. Hence, the debts of the DRPA are not the debts of either state.

The DRPA was initially funded by contribution from both states. However, that factor has become irrelevant, since the DRPA is now financially self-sustaining. Any judgment against the DRPA would not come from either state treasury, but rather from the DRPA itself.

In *Fitchik* we found that the New Jersey Transit Rail Operations, Inc. ("NJTRO") was not an arm of New Jersey even though the state provided approximately thirty-three percent of the NJTRO's revenues. 873 F.2d at 660–61, 664. Likewise, in *Bolden* we concluded that the Southeastern Pennsylvania Transportation Authority ("SEPTA") was not an alter ego of the state even though Pennsylvania provided twenty-seven percent of its revenues. 953 F.2d at 819, 821. In comparison to NJTRO and SEPTA, the DRPA is self-sustaining and not dependent on either state for funding, clearly dictating that it, like the NJTRO and SEPTA, is not an arm of New Jersey or Pennsylvania. The funding factor, the most important of the three factors, weighs very heavily in support of the conclusion that the DRPA is not the alter ego of either state for purposes of the Eleventh Amendment.

2. *Status under state law.* The second factor to consider in determining whether the DRPA is an alter ego of New Jersey or Pennsylvania is the status which it has under state law. In *Yancoskie v. Delaware River Port Auth.*, 478 Pa. 396, 387 A.2d 41 (1978), the Pennsylvania Supreme Court held that the DRPA was not an arm of the Commonwealth and not entitled to sovereign immunity. The court stated:

> We believe that an analysis of the legislative acts defining the purposes and powers of the Delaware River Port Authority, together with the relevant judicial decisions, requires a conclusion that ... the Authority is not "an integral part of the Commonwealth" and that it is therefore subject to suit, as are "political subdivisions or gov-

ernmental entities other than the Commonwealth itself."

*Id.* at 398–99, 387 A.2d at 42 (citations omitted).

Similarly, the New Jersey Supreme Court has held, in a personal injury suit, that the DRPA is not treated as a "public entity" within the New Jersey Tort Claims Act and therefore does not enjoy immunity under that Act. *Bell v. Bell,* 83 N.J. 417, 423, 416 A.2d 829, 832 (1980).

Like SEPTA in *Bolden* and NJTRO in *Fitchik,* the DRPA possesses "attributes not characteristic of an arm of a state." *Bolden,* 953 F.2d at 820. For example, the DRPA has the power to enter into contracts and to make purchases without state approval. Compact art. IV(f)–(h); *see Bolden,* 953 F.2d at 820. On the other hand, like SEPTA in *Bolden* and NJTRO in *Fitchik,* the DRPA possesses some attributes under state law which are normally associated with the state. These include the exemption from state property taxation, Compact art. XI, and the power of eminent domain, Compact art. IV(k); *Bolden,* 953 F.2d at 820. However, on balance, and especially in light of the clear holding in *Yancoskie* by the Pennsylvania Supreme Court that the DRPA is not " 'an integral part of the Commonwealth,' " 478 Pa. at 406, 387 A.2d at 46, the DRPA's status under state law weighs heavily in support of the conclusion that the DRPA is not an arm of either state.

3. *Autonomy.* The third factor to consider in determining whether the DRPA is an arm of New Jersey or Pennsylvania is the degree of autonomy from state control which the DRPA enjoys. There is in fact a significant measure of state control over the DRPA. This control is exercised most directly by the states through the appointment of the sixteen members of the Board of Commissioners (the "Board"). As noted above, the Board is the ruling body of the DRPA. Membership of the Board is split evenly, with eight members from New Jersey and eight from Pennsylvania. Compact art. II. The Governor of New Jersey appoints all that state's members while the Governor of Pennsylvania appoints six of the eight members representing the Commonwealth. *Id.*

The other two Pennsylvania Commissioners are the Auditor General and the State Treasurer who serve ex-officio. *Id.*

Other facts support the argument that the DRPA is autonomous, such as the DRPA's separate corporate existence, Compact art. I, its power to enter into contracts, Compact art. IV(f), its power to hold property, Compact art. IV(g), (h), and its power to set and collect tolls, Compact arts. IV(j), VIII. On balance, however, the significant control the states have through appointing the DRPA's Board weighs slightly in favor of the DRPA's being an alter ego of the states. *See Fitchik,* 873 F.2d at 663–64 (substantial degree of control over the New Jersey Transit Corporation ("NJT") by the governor weighed "slightly" in favor of according immunity to the NJT).

 4. *The totality of factors.* Having considered each of the three factors above, we now must balance the three factors in their totality. *See Bolden,* 953 F.2d at 821. Since two of the three factors weigh heavily against a finding that the DRPA is an arm of a state, including the first and most important factor of funding, the balance is clearly struck against a finding that the DRPA is an alter ego of either New Jersey or Pennsylvania.[6]

Consequently, because the DRPA is not an arm of either state, the position of the DRPA

that it is not a "person" under § 1983 fails. We hold that the DRPA is amenable to suit under that statute.[7]

**B. The *Branti–Elrod* Claim**

Having concluded that the DRPA is amenable to suit under § 1983, we now address the merits of Peters' substantive constitutional claim. Peters claims that the DRPA infringed his constitutional rights of free speech and association by failing to reappoint him as its Secretary solely because he is a member of the New Jersey Republican Party.

The Supreme Court has held that it is a violation of a public employee's First Amendment rights to demote, transfer, fire, or not reappoint to a position, such an employee on the basis of his or her political affiliation. *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 72–78, 110 S.Ct. 2729, 2736–39, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 511–20, 100 S.Ct. 1287, 1291–96, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 355–73, 96 S.Ct. 2673, 2680–89, 49 L.Ed.2d 547 (1976). However, the Court has recognized exceptions to this rule. Party affiliation may be an acceptable requirement for an employee who "acts as an adviser or formulates plans for the implementation of broad goals." *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687.

---

**6.** The DRPA cites *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), in support of its argument that as a bi-state entity formed through interstate compact, it is entitled to Eleventh Amendment immunity. However, as the Supreme Court in *Lake Country Estates* stated:

> If an interstate compact discloses that the compacting States created an agency comparable to a county or municipality, which has no Eleventh Amendment immunity, the Amendment should not be construed to immunize such an entity. Unless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose, there would appear to be no justification for reading additional meaning into the limited language of the Amendment.

*Id.* at 401, 99 S.Ct. at 1177. Our Eleventh Amendment analysis above reveals that the DRPA is not entitled to Eleventh Amendment immunity.

**7.** *See supra* note 5. The DRPA relies heavily on our decision in *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. and N.J.,* 819 F.2d 413 (3d Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987) (hereinafter *"PBA"*), in support of its position that the DRPA is an alter ego of Pennsylvania or New Jersey. However, the government entity involved in *PBA,* the Port Authority of New York and New Jersey (the "Authority"), is substantially different from the DRPA. For example, in *PBA,* we found that any judgment against the Authority could have some impact upon the state treasury. *Id.* at 416. Moreover, we noted in *PBA* that the courts of New York and New Jersey have consistently held that the Authority is a state agency performing functions on behalf of the state. *Id.* at 415. Finally, we found in *PBA* that the actions of the commissioners of the Authority are subject to veto by the governor of either New York or New Jersey. *Id.* at 417. Therefore, we find that our decision in *PBA* is distinguishable and not controlling in this case.

In *Branti*, the Court described the test for the exception as such: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295.

█ In making this determination, we examine the functions performed by the individual occupying the relevant position. *Waskovich v. Morgano*, 2 F.3d 1292, 1297 (3d Cir.1993). As the Supreme Court explained, "[t]he nature of the responsibilities is critical." *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687. Although "[e]ach decision is ... fact specific for that case," *Zold v. Township of Mantua*, 935 F.2d 633, 635 (3d Cir.1991), a question relevant in all cases is "whether the employee has 'meaningful input into decision making concerning the nature and scope of a major [government] program.'" *Brown v. Trench*, 787 F.2d 167, 169–70 (3d Cir.1986) (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982)).

> [I]t is appropriate to consult factors such as 'whether the employee's duties are simply ... nondiscretionary or technical, ... whether the employee participates in ... discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers.'

*Waskovich*, 2 F.3d at 1297 (quoting *Brown*, 787 F.2d at 169).

█ We also focus our analysis on " 'the function[s] of the public office in question and not the actual past duties of the particular employee involved.'" *Id.* (quoting *Brown*, 787 F.2d at 168); *see also O'Connor v. Steeves*, 994 F.2d 905, 911 (1st Cir.1993) (" 'the *actual* past duties of the discharged employee are irrelevant if the position *inherently* encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance'" (citation omitted)), *cert. denied*, —— U.S.

——, 114 S.Ct. 634, 126 L.Ed.2d 593 (U.S. 1993). However, while the actual duties performed by the officeholders are not determinative, they may be informative. *Waskovich*, 2 F.3d at 1300.

"It is not always easy to determine whether political affiliation is a legitimate factor to be considered for a particular job," *Zold*, 935 F.2d at 635, and each decision is fact specific. We have held that party affiliation may be the basis for dismissal of a director of a veterans' organization, *Waskovich*, 2 F.3d at 1298–1303; an assistant director of public information, *Brown*, 787 F.2d at 169–70; assistant district attorneys, *Mummau v. Ranck*, 687 F.2d 9, 10 (3d Cir.1982) (*per curiam*); and city solicitors and assistant city solicitors, *Ness*, 660 F.2d 517, 522–23 (3d Cir.1981). On the other hand, we have held that *Branti–Elrod* protection extends to deputy sheriffs, *Burns v. County of Cambria, Pa.*, 971 F.2d 1015, 1023 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); deputy township clerks, *Zold*, 935 F.2d at 636–40; and a county's second deputy recorder of deeds, *Furlong v. Gudknecht*, 808 F.2d 233, 236–37 (3d Cir. 1986).

█ Although the plaintiff in a *Branti–Elrod* action has the ultimate burden of proof to demonstrate that her First Amendment rights have been infringed because of her political affiliation, *Zold*, 935 F.2d at 640, the defending government entity has the burden of proof to demonstrate that an encroachment on an employee's First Amendment rights falls within the exception for employment where the party affiliation of the officeholder is appropriate. *Elrod*, 427 U.S. at 368, 96 S.Ct. at 2687; *Zold*, 935 F.2d at 635.

█ Peters asserts that the DRPA must demonstrate that party affiliation is "highly likely" to cause him to be ineffective in carrying out the duties and responsibilities of the office of Secretary. However, in *Ness*, we merely stated that "we would *at least* conclude that should a difference in party affiliation be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office, dismissals for that reason would not offend the First

Amendment." 660 F.2d at 521 (emphasis added). This language indicates that for the exception to apply it would be *sufficient* for a defending government entity to demonstrate that a difference in party affiliation would be highly likely to cause an official to be ineffective in carrying out her duties; but we did not suggest that such a showing is *necessary* in every case. Absent further direction from the Supreme Court, we will apply the test announced in *Branti*, and consider "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295.

"If there is no material factual dispute as to whether political affiliation is a permissible job requirement, summary judgment is appropriate." *Waskovich*, 2 F.3d at 1296. In this case, we have available the essential facts concerning the duties of the office in question, and the parties disagree as to how the job of Secretary should be characterized. Since our standard of review of summary judgment determinations is plenary, it is appropriate for us to determine whether, as a matter of law, the position of Secretary falls under the exception to *Branti–Elrod. See Zold*, 935 F.2d at 636.

■ The district court determined that the exception to *Branti–Elrod* could not apply to the position of Secretary. In its holding, it stated that the bi-state nature of the DRPA mandates that the functions of the Secretary be carried out in a non-political manner. *Peters v. Delaware River Port Auth. of Pa. and N.J.*, 809 F.Supp. at 13, 16–17. The court reasoned as follows:

> The duties of the Secretary cannot involve partisan political interests, for the simple reason that the Secretary does not serve an organization designed to further the political agenda of any one elected administration or officeholder. . . . The authors of the Compact sought to prevent either state from ever obtaining dominance over the other. Thus, the Compact provides

not only equal state representation but also requires that all actions must be passed by a majority of the representatives of each state rather than by a simple majority of Board [sic] (Compact, Art. III). Under this scheme, the Secretary of the DRPA necessarily must be loyal to DRPA as a whole and not to either state or to any particular commissioner. If anything, the nature of the position compels the conclusion that the Secretary must be non-political to serve effectively in light of the potentially divergent interests of two different states, two different gubernatorial administrations, and the independently elected Auditor General and State Treasurer of Pennsylvania.

*Id.*

We reject the district court's reasoning. No Supreme Court decision, or any other decision of which we are aware, has held or even suggested that merely because a government entity is composed of membership from more than one state, the exception to *Branti–Elrod* would not apply to positions within that entity. Rather, the Supreme Court has directed that we focus on the nature of the responsibilities of the particular position in question, *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687, and we focus on the functions of the particular position to determine if the officeholder "acts as an adviser or formulates plans for the implementation of broad goals," *id.* at 368, 96 S.Ct. at 2687, *quoted in Zold*, 935 F.2d at 635. There is little reason to believe, *a priori*, that merely because a government entity is composed of membership from more than one state, that the officers employed by that entity cannot formulate plans or implement broad goals. Furthermore, the mere fact that an entity is composed of membership from more than one state does not suggest that party affiliation will be irrelevant to the effective performance of the offices within that entity.

■ The DRPA has broad powers, leaving much room for principled disagreement on policy goals or their implementation.[8]

---

8. The dissent takes the majority to task for stating that there is "room for principled disagreement on policy goals or their implementation." Dissent at 1361. Whether a position involves

government decisionmaking on issues where there is room for principled disagreement on policy goals is a question which at least five other courts of appeals consider in evaluating

For example, in addition to operating its current facilities, the Compact charges the DRPA with developing a master economic plan for the Port District. Compact art. XII(7). "Prior to adopting such master plan, the commission shall give written notice to, afford a reasonable opportunity for comment, consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities and the private sector." *Id.* Such consultation and interaction with government officials and private corporations concerning the development of a major economic plan will surely involve political considerations and policymaking on the part of the higher officials within the DRPA.[9]

The policy and political issues, including economic considerations, arising in an entity such as the DRPA are many. If tolls are raised, bridges fall into disrepair, or traffic is congested, there are surely political consequences. Whether decent roads and transit systems will be made available to all segments of the communities, or will be provided in a manner perceived as favoring some or excluding others, raises important and sensitive social, economic and political questions. The fact that the DRPA is composed of membership from two states does not alter

or reduce the likelihood that these matters must be considered and dealt with. Since the governors of New Jersey and Pennsylvania directly appoint fourteen of the sixteen member Board of Commissioners, political responsibility for the DRPA's successes and failures can be expected to fall on the ruling administration of each state.[10]

The district court noted that the DRPA is not designed to further the political agenda of any one state or administration. But it does not follow from this that party affiliation is not appropriate to the effective performance of the higher positions within the DRPA. For example, if a particular policy would benefit both New Jersey and Pennsylvania, it would be important for those states to have in place officers who agreed with and furthered that policy. Obviously, the party affiliation or policy views of the officers in the DRPA could be relevant to the effective presentation and implementation of particular policy goals. If the states preferred huge increases in spending for the construction of bridges, for example, they might legitimately prefer that high positions in the DRPA not be filled with individuals belonging to a party which advocates decreased government spending.[11]

*Branti–Elrod* claims. *O'Connor v. Steeves,* 994 F.2d 905, 910 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 634, 126 L.Ed.2d 593 (U.S. Dec. 13, 1993); *Green v. Henley,* 924 F.2d 185, 186–87 (10th Cir.1991); *Hall v. Ford,* 856 F.2d 255, 262 (D.C.Cir.1988); *Ray v. City of Leeds,* 837 F.2d 1542, 1544 (11th Cir.1988); *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

Arguing that the majority has not demonstrated that the position of Secretary of the DRPA has a nexus to partisan processes, Judge Nygaard compares the position of Secretary to a football coach, dissent at 1361, and a pothole repair supervisor, *id.* at 1361. We do not find these analogies apt. Not only is there room for principled disagreement in the higher positions within the DRPA, but there are also political and partisan considerations and consequences involved with the DRPA's higher offices which the majority would agree do not arise for football coaches and pothole repairmen.

9. Judge Nygaard in his dissent argues that the DRPA "is inherently and functionally nonpartisan. That is to say, *its job remains the same* regardless of any shifts in party power." Dissent at 1361 (emphasis added). To the contrary, the

DRPA's job does not remain the "same," because the DRPA has been delegated extraordinary discretion and a substantial annual budget to achieve its broad goals. This degree of discretion necessarily means that the DRPA's activities can and will vary according to the policy choices made by the higher officials within the DRPA. It therefore is not accurate to say that its job remains the "same." To the extent that its job remains the same, the same could be said of even the highest elective offices in the nation. Yet no one would argue that high elected officials are protected under *Branti–Elrod.*

10. The dissent states that these consequences "would have no significant impact on the party of an elected political administration." Dissent at 1361. We see no basis for the dissent's assertion that elected leaders and ruling parties do not face political responsibility for their actions.

11. The dissent argues that since a majority of the commissioners from each state is required for the DRPA to act, this is "evidence that the DRPA is intended to be insulated from partisan politics." Dissent at 1362. This conclusion is suspect. The principle of majority rule, a feature of representative democracy, actually captures and

Because the DRPA serves at least two different states' interests, it is forced to deal with more than one administration and a complex group of political interests. The DRPA needs officers who are capable of efficiently, effectively and loyally accessing the political channels that influence the DRPA's agenda and direction. The DRPA may choose to retain employees who can be knowledgeable of and be trusted by each state's executive and legislative political infrastructures. Party affiliation can be expected to be an important requirement to effectively carry out these tasks.

■ The district court also assumed that positions such as Secretary cannot be filled with individuals partial to one of the states, and must be filled by individuals who will always serve the mutual interests of New Jersey and Pennsylvania. But while the DRPA was created to achieve mutually beneficial goals, it did not compel each state to abandon all partisan political considerations and interests. In fact, the New Jersey and Pennsylvania delegations to the DRPA, as would be expected, continue to act as economic competitors.[12] The district court assumed that in governing the DRPA, this competition and the likelihood that there will be political differences between New Jersey and Pennsylvania concerning DRPA governance and policies will result in a situation that will minimize any need for the expertise of staff members who are politically sophisticated. We think the court erred in this

respect. In fact, either state alone, or both states working together, might choose to accomplish broad economic goals at the DRPA through partisan or bipartisan means. Moreover, because the governor from each state appoints members of the Board, and because the Board in turn elects the positions of Chairman, Vice–Chairman, Secretary, and Treasurer, it can be expected that at various times particular members of the Board and the officers they elect will be partial to one particular state, administration or political party. Indeed, such loyalty among the individual members of the DRPA, in light of political reality, may be appropriate in order for each state to maintain a balance of power within the DRPA. The Compact itself provides that the Secretary and Treasurer "need not be members of the [Board]." Compact art. IV(d). Thus, the Compact allows, but does not require, the Board to elect their own members (who are political appointments) to act as Secretary and Treasurer. Contrary to the lower court's assumption, the Compact thus specifically considers and allows the possibility that the position of Secretary would be filled by individuals who are loyal to a particular state's governing administration, a particular political party, or to a particular group within the Board. Therefore, party affiliation can be expected to be an important requirement for the effective performance of the higher positions within the DRPA, including that of Secretary.[13]

embraces political disagreement, and offers a non-violent means of settling such political disputes. The creators of the DRPA surely recognized that there would be political victors and losers as a result of such votes. The fact that a majority of votes is needed gives a governor even more reason to appoint commissioners who agree with his philosophy and policies of government. We do not understand how the dissent views the principle of majority rule as evidence that the agency is to be removed from politics or party affiliation.

12. We take judicial notice of newspaper accounts indicating that the New Jersey and Pennsylvania delegations within the DRPA are at times in competition with one another. For example, the Philadelphia Business Journal reported:

After 10 years without a fare increase, and as the DRPA's monthly subsidies to PATCO, its subsidiary, have snowballed in the last few

years, commissioners appeared to reach a consensus that rates will have to rise....

The subject has long been a volatile one, pitting the Pennsylvania and New Jersey delegations against each other, because the line's customers are overwhelmingly New Jersey residents commuting to work in Philadelphia.

David M. Halbfinger, *No Blockbusters From Secret DRPA Meeting*, Philadelphia Bus.J., March 29–April 4, 1993, at 3, 12.

Another article stated that "both [New Jersey and Pennsylvania] have tried to tap the [DRPA's] funds to develop piers, but every attempt has been thwarted by the state that enjoyed a competitive advantage at the shipping docks at the time." Michael Fabey, *DRPA Intends to Exert Its Influence Far From Riverfront*, Philadelphia Bus. J., Sept. 23–29, 1991, at 1, 26.

13. The dissent argues that because fourteen of the sixteen commissioners serve for five-year terms, while the term of the New Jersey and

The fact that the DRPA is composed of more than one state has not removed it from political controversy. While not critical to our holding, we take judicial notice of newspaper accounts highlighting controversies over the DRPA's toll increases, spending practices, and public announcements.[14] Those employed by the DRPA must effectively anticipate, avoid, or deal with such political controversies, and party affiliation can be expected to be significant in carrying out these functions.

We reject the proposition that a bi-state entity, by its very nature, mandates that the functions of the offices within the entity be carried out in a non-political manner. The district court cited no authority in the Compact itself, any state or federal legislation, or case law, requiring the DRPA to ignore the reality of partisan political and economic interests in order to achieve its complex and broad goals. The rationale of the district court would hinder and stifle the Board from utilizing high level personnel in a manner which could effectively accomplish its broad-ranging aims and objectives. Nothing in law or political reality suggests that government entities composed of membership from more

than one state, including the DRPA, should be prevented from demonstrating that the exception to *Branti–Elrod* protection applies.

■ We therefore turn to an analysis of the function of the position of Secretary to determine whether it is one for which party affiliation may be an appropriate requirement. Article III, Section D of the By-laws of the DRPA details the duties of the Secretary as follows:

> The secretary, reporting to the Executive Director, shall be the custodian of all records and the seal of the Authority and shall keep accurate minutes of the meetings of the Authority and all of the committees thereof. He shall, on behalf of the Authority certify, when required, copies of records and shall execute legal instruments and documents on behalf of the Authority when ordered to do so, and affix the seal of the Authority to the same, *and shall perform such other duties as may be directed by the Authority.*

App. (92–2101) at 45. (emphasis added). The "other duties" which the Secretary has been charged with performing are described in the official description of the position of

---

Pennsylvania governors is four years, this is "compelling evidence of the drafter's intent to keep the DRPA out of patronage and partisan politics." Dissent at 1362.

First, we note that since the New Jersey and Pennsylvania governors directly appoint fourteen of the sixteen commissioners, the suggestion that the drafters intended to keep the DRPA out of patronage and partisan politics is not feasible. The fact is that the commissioners are political appointments.

Second, the mere fact that the governors' and the commissioners' positions are not co-terminus is not evidence that the DRPA was meant to be removed from patronage and partisan politics. Certainly, a one year difference between the four- and five-year terms would not be enough to accomplish the goal of removing the DRPA from politics. This is especially so since the governors may serve two consecutive terms, for a total of eight years. More likely, the drafters of the Compact sought to maintain a small degree of continuity and stability in the DRPA by providing terms for the commissioners slightly longer than that of governor.

**14.** For example, a major newspaper reported the following:

> . A series of articles in the Courier Post of Camden questioned the spending practices of

the Delaware River Port Authority, which operates four bridges and a high-speed transit line on a budget of $100 million, and spends $3.5 million annually to market the Philadelphia area ports.

> The agency, based in Camden, has offices abroad as well as in Chicago, Houston, Philadelphia, Pittsburgh and New York City. The agency spent $285,000 for foreign and domestic trips since 1987 and 1990.

> Reacting to the reports, Governor Florio [of New Jersey] wrote Gov. Robert F. Casey of Pennsylvania last month suggesting a meeting to discuss ways to "insure the fiscal integrity" of the authority.

Peter Kerr, *Battered on Taxes, Florio Warily Considers Higher Tolls,* N.Y. Times, Jan. 5, 1991, at 23–24. *See also* David M. Halbfinger, *No Blockbusters From Secret DRPA Meeting,* Philadelphia Bus.J., March 29–April 4, 1993, at 3, 12 (reporting that the subject of fare increases at the DRPA "has long been a volatile one, pitting the Pennsylvania and New Jersey delegations against each other"); Michael Fabey, *Wilmington Port Is Philly's Partner and Competitor,* Philadelphia Bus. J., Jan. 25–31, 1993, § 2, at 3B (reporting that Wilmington Port, a competitor of the DRPA, criticized the DRPA for misrepresenting to Central Americans that the DRPA handled more bananas than any other port in the country).

Secretary promulgated by the Board in 1983. App. (92–2101) at 67–70. This document lists, among others, the following duties: reviewing correspondence, reports, communications and sources of information and making appropriate recommendations to the President (Executive Director) of the DRPA; assisting in planning for the improvement and expansion of DRPA facilities, operations, organization and management; participating in high-level DRPA matters with commissioners, committees, operating staff, public officers and other bodies; attending the executive sessions of the DRPA as requested and participating in all policy-forming discussions during executive sessions of the DRPA; acting as liaison and maintaining good public relations with other agencies; assisting the coordination of operational divisions and staff at the DRPA; and interpreting and executing DRPA policy. *Id.* at 67.

The duties described above clearly support the conclusion that the Secretary acts as an advisor or formulates plans for the implementation of broad goals. *See Zold,* 935 F.2d at 635. The official description specifically states that the Secretary is to take part in policy-forming discussions. As noted above, the DRPA is a significant economic entity, with broad powers to design and implement an economic plan for the Port District. The Secretary will take part in policy discussions involving numerous planning and policy issues, and the political consequences of such policies. Party affiliation can be expected to be significant in carrying out these duties. Moreover, party affiliation is unquestionably significant to the Secretary's duties of maintaining good public relations and acting as a liaison with public officials. *E.g., Brown,* 787 F.2d at 170.[15]

The pre-trial record reflects that the job description of Secretary accurately describes the duties and functions of the job. Peters acknowledged during testimony at his deposition that as Secretary he met with New Jersey State officials and New Jersey State task forces to coordinate actions of the DRPA. App. (92–2101) at 283–85. He also stated that he communicated with state legislators regarding DRPA matters, *id.* at 285, and had contacts with the news media concerning DRPA programs, *id.* at 225–26, 289–90.

■ In addition to the official job description, other factors reveal that the exception to *Branti–Elrod* applies. When last employed by the DRPA, Peters was earning approximately $57,000 annually. In *Waskovich,* where we held that the exception to *Branti–Elrod* applied to the position of Director of the Division of Veterans' Administrative Services, the Director was earning $64,000 per year. 2 F.3d at 1298. Thus, the amount of Peters' salary is a factor weighing in favor of finding that the exception to *Branti–Elrod* applies.

Peters himself described his duties in his resume. App. (92–2101) at 309–11. He said:

> Responsible for direction and management of total daily operations of an Authority operating four bridges, realizing $100 million in annual revenues and employing a professional and skilled staff of approximately 1,000. Manage an annual budget of $50 million. Promoted the ports of the Delaware Valley while supervising daily activities of the Budget, Economic Development, and Port Operations, Bridges, Public Relations, Personnel, Security, and Engineering departments.

*Id.* at 309. While the actual duties performed by officeholders are not determinative, they are informative. *Waskovich,* 2 F.3d at 1300. We have indicated that preparing budgets and promoting projects are duties which count in favor of finding that the exception to *Branti–Elrod* applies. *Id.* at 1297; *Brown,* 787 F.2d at 169–70. The actual duties described by Peters himself include promoting projects and managing a budget, thus supporting a finding that the office of Secretary is one which falls under the exception to *Branti–Elrod.*

Also instructive to our determination is a document authored by Peters while Secre-

---

**15.** In *Zold,* we found that a deputy township clerk who acted as a liaison occupied a position which did not fall under the exception to *Branti–Elrod.* 935 F.2d at 638, 640. However, the employee in that case, unlike Peters in the instant action, was not officially assigned the duty of acting as liaison and did not promote policies of the organization. *Id.* at 638.

tary in which he analyzed the DRPA's organizational structure and recommended significant changes. App. (92–2101) at 312–51. This document indicates that Peters acted as an advisor of broad goals. Moreover, a former Secretary of the DRPA, Steven Joachim, attested that, consistent with the job description of Secretary, he was assigned sensitive and important responsibilities on a variety of important policy matters. *Id.* at 491–92.

In light of the uncontested facts before us, we find that, as a matter of law, the duties inherent in the position of Secretary are such that party affiliation is an appropriate requirement for the effective performance of that position.[16] The district court therefore erred in denying the DRPA's motion for summary judgment.

### IV.

For the foregoing reasons, we will reverse the judgment of the district court entered on January 8, 1993, and remand the case to the district court with a direction to enter judgment for the defendant.

NYGAARD, Circuit Judge, concurring and dissenting:

I join in parts I–III(A) of the majority opinion. I respectfully dissent because I believe the district court correctly concluded that the exception to the *Elrod–Branti–Rutan* doctrine was both inapplicable to the DRPA and unwarranted by these facts.

### I.

It is well to first place the issue in perspective and note just what this case is all about. It is about a political party's power to command membership or some pledge of allegiance to the party as a requirement for public employment. It is about Walter T. Peters' constitutional right secured by the First and Fourteenth Amendments to affiliate with the political party of his choice without fear that he will lose his livelihood as a result. I begin with the law as set forth by the Supreme Court. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a plurality of the Court annunciated a "positional" test and held that public employees' political affiliation enjoyed constitutional protection and one could not be dismissed on the basis of party affiliation unless one held a "policymaking" position. *See id.* at 367, 96 S.Ct. at 2687 (plurality op.); *id.* at 374–75, 96 S.Ct. at 2690 (Stewart, J., concurring). Writing for the plurality, Justice Brennan pointed out that political affiliation is protected by the First Amendment; accordingly, for a political patronage dismissal to be justified, the governmental body must demonstrate that it possesses an overriding (not merely legitimate) reason before encroaching on the employee's constitutional rights. Moreover, the interest of the government must not be confused with that of a political party; the interest asserted must belong to the government in its governmental role. Finally, the infringement of protected rights must be the least restrictive one possible. *Id.* at 362–63, 96 S.Ct. at 2684–85.[17]

Thus, the plurality held that merely because an employee belongs to a different political party than the one currently in power does not support the inference that he or she will undermine governmental effectiveness and can be dismissed solely on partisan grounds, noting that an ineffective or insubordinate employee may be fired *for good cause. Id.* at 365–66, 96 S.Ct. at 2685–86. The plurality instead carved out a very narrow exception for policymaking *positions. Id.* at 367, 96 S.Ct. at 2687. It acknowledged that the line between policymaking and nonpolicymaking positions is difficult to draw and placed the burden of proving the policy-

---

**16.** In light of our holding, it is unnecessary for us to address the numerous evidentiary objections or the excessive damages issue which the DRPA raised in this appeal, nor to address its motion for a new trial.

The DRPA also appeals the denial of its motion for leave to assert a counterclaim against Peters. The district court determined that the motion for leave to assert a counterclaim was untimely. We find no abuse of discretion in that determination, and will affirm the denial of leave to assert the counterclaim.

**17.** This principle was reaffirmed by a majority of the court in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52 (1990).

making nature of the jeopardized position on the government.

Four years later, in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), a clear majority of the Court refined and tightened the exception recognized by the *Elrod* plurality by adding a "personal" overlay. First, the Court stated that only if an *employee's* political beliefs would (not "could") interfere with the performance of his or her duties, could an employee's constitutional rights could be overridden and the employee dismissed for political reasons. *Id.* at 517, 100 S.Ct. at 1294. Second, the Court re-examined the *Elrod* "positional" test and determined that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* at 518, 100 S.Ct. at 1295. It then recast the *Elrod* test as follows:

> [T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Id.* The Court held that an assistant public defender could not be dismissed because of his or her political beliefs. Although the job of a public defender might well entail policymaking and would certainly involve confidential information, both factors concerned only the representation of criminal defendants and had no impact on the governmental process. *Id.* at 519, 100 S.Ct. at 1295.

We too have given close scrutiny to any contention that a position was subject to political dismissal. In three cases, we further defined the *Elrod–Branti* burden and set forth a standard that only when a difference in political affiliation is "highly likely" to make the employee ineffective, may a politically motivated dismissal pass constitutional muster. *Waskovich v. Morgano,* 2 F.3d 1292, 1297 (3d Cir.1993); *Zold v. Township of Mantua,* 935 F.2d 633, 635 (3d Cir.1991); *Ness v. Marshall,* 660 F.2d 517, 521 (3d Cir.1981). The majority dismisses this standard as essentially mere dictum (maj. op. at 1353–54). I disagree.

The majority is correct, so far as it goes, that in *Ness,* we did not explicitly hold that "highly likely" was the burden to be met in all cases. We did, however, repeat this formulation of the standard in both *Zold* and *Waskovich.* Moreover, in *Waskovich,* we noted that the exception for political dismissals is a narrow one. 2 F.3d at 1297 (citing *Burns v. County of Cambria,* 971 F.2d 1015, 1023 (3d Cir.1992)). This alone counsels against the majority's expansion of the *Elrod–Branti* exception.

More importantly, I think the majority incorrectly cramps the scope of Peters' First Amendment rights. In *Zold,* we cited *Elrod* for the proposition that the government must demonstrate an "overriding interest" to justify an exception to the general rule forbidding a politically motivated dismissal. 935 F.2d at 635. This discussion took place in the same paragraph in which we cited the *Ness* "highly likely" standard. The majority fails to recognize what was implicit in *Zold* and is obvious in any event: if a political difference is not highly likely to render an employee ineffective in his or her assigned duties, the government interest in a politically motivated dismissal cannot possibly override his or her constitutional rights.

Properly viewed, then, the *Elrod–Branti* exception for policymaking positions is just that—an exception—sparingly granted and narrowly construed to cover situations in which a governmental decisionmaker or body, accountable to a political party and whose power is delegated to it by the people, has the legitimate expectation that a specific key employee both shares with it the same viewpoint mandated by a ballot to the dominant party, and moreover, will effectuate governmental policies accordingly. Applying the test to *Ness,* we concluded that a city solicitor who reported to the mayor could be dismissed for partisan political reasons. 660 F.2d at 521. The solicitor was an expert on whom the mayor relied to render opinions, draft ordinances and negotiate contracts. We stated that the mayor who is, after all, a party's nominee and elected by partisan ballot, "has the right to receive the complete cooperation and loyalty of a trusted adviser,

and should not be expected to settle for less."
*Id.* at 522.

## II.

This brings me to the particulars of this case. While undoubtedly the DRPA, like any governmental agency or business, has a need for a loyal confidant in the position of Secretary, this need cannot come within the *Elrod–Branti* exception unless the loyalty is not merely to the position, but is necessarily to a partisan political interest. *See Burns,* 971 F.2d at 1022 (citing *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–42 (1st Cir.1986) (en banc) ("A threshold inquiry, which derives from *Branti,* involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political concerns. . . . Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?" (citations and internal quotations omitted)). The majority strives mightily to demonstrate how the structure, organization and functions of the DRPA relate to a political party's interest. It is unable, however, to refute the reasoning of the district court that, although the DRPA no doubt has "broad powers" (as do many government agencies and businesses), it is inherently and functionally nonpartisan. That is to say, its job remains the same regardless of any shifts in party power.

First, the majority notes that there is "room for principled disagreement on policy goals or their implementation." (Maj. op. at 1354–55.) Of that I have no doubt; yet, the same would be true of a doctor in a government hospital or a football coach at a state university. Without a nexus to partisan processes, however, this fact is quite irrelevant. *See Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

Second, the majority points to the possibility of political consequences stemming from the success or failure of DRPA policies. This is also true—and equally irrelevant to the analysis. What the majority fails to recognize is that those consequences would have no significant impact on the party of an elected political administration. Assume for example, that Peters somehow subverted for political ends the bridge maintenance plans of the DRPA, causing traffic delays and resulting in irate commuters. No doubt this subversion would make the DRPA an unpopular entity, but no more so than if a local road supervisor failed to repair potholes in the road. Both could be fired for cause, but the political affiliation of neither is material. I conclude the partisan processes are simply too removed from the affairs of the DRPA for Peters' party affiliation to adversely affect its government processes.

Third, the majority argues that, *because* of the bi-state nature of the DRPA and its need to interact with the elected officials of both states, its staff members must be "politically sophisticated" (maj. op. at 1356). That fact, however, does not by itself create a nexus with *partisan* political concerns that relate directly to the success or failure of the party's policy agenda. Many positions in government and business require the ability to deal with and lobby political bodies and officials of both parties. "Political sophistication," quite simply, is not the test enunciated by *Elrod* and *Branti.*

Fourth, the majority asserts that "political reality" dictates that political affiliation is relevant to maintain the balance of power on the DRPA between New Jersey and Pennsylvania (maj. op. at 1356–57). Specifically, the majority regards the fact that the positions of Secretary and Treasurer may be filled by DRPA commissioners as some evidence that party loyalty and affiliation was considered relevant to those positions by the drafters of the DRPA Compact. I disagree. If anything, I think the requirements of the Compact show quite the opposite. The Compact requires that the Chairman and Vice–Chairman of the DRPA be sitting commissioners, while the Secretary and Treasurer need not be. That requirement is strong evidence of which positions the drafters thought were partisan. Because the Compact permits the latter two positions to be filled by non-commissioners, it follows that

party loyalty is simply *not* relevant to the duties of the Secretary and Treasurer. "Political reality" is only a euphemism for the functionally illegitimate practice of rewarding the party faithful and is hence "at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod*, 427 U.S. at 357, 96 S.Ct. at 2682 (citing *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 576 (7th Cir.1972)). It has no business in the equation by which we counterbalance a constitutionally protected interest.

Additionally, I note that the commissioners, with the exception of the two *ex officio* members from Pennsylvania, serve for five-year terms, while the term of the New Jersey and Pennsylvania governors is four years. Had the drafters of the Compact considered political affiliation and responsiveness to partisan politics in both states to be essential to the governance of the DRPA, it follows that the commissioners would have been given four-year terms. If anything, then, these five-year terms are compelling evidence of the drafter's intent to keep the DRPA out of patronage and partisan politics.

Moreover, that a majority of the commissioners from each state is required for the DRPA to act is also evidence that the DRPA is intended to be insulated from partisan politics. For example, assume New Jersey's Republican governor appoints eight Republicans to the DRPA, while Pennsylvania's Democratic governor appoints six Democrats. Assume further that the Pennsylvania State Treasurer and Auditor General are both Republicans. Republicans would then hold a 10–6 majority on the DRPA. Yet, if the six Pennsylvania Democrats held together in opposition to a plan put forth by all the Republicans, the plan could not be implemented by the DRPA. If the DRPA were intended to be responsive to partisan political pressures, one would not find such a provision in its Compact.

I have no doubt that the DRPA, regardless of design, is not apolitical. It responds to the governmental interests of the State of New Jersey and the Commonwealth of Penn-

sylvania. That, however, is not a *partisan* political concern. Simply stated, it cannot be said that party affiliation is a *requirement* for efficient performance of Peters' duties, which is the minimum the *Elrod–Branti* line of cases require if he is to be subject to political dismissal. I would therefore affirm. I believe the majority has misconstrued the rationale and purpose behind the political dismissal doctrine and has broadened the exception to the point that it endangers the rule. Walter T. Peters was fired because of his political beliefs and party affiliation, and from a position where neither mattered. I respectfully dissent.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges.

## SUR PETITION FOR REHEARING

### Feb. 22, 1994

The petition for rehearing filed by appellee having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

NYGAARD, Circuit Judge, would have granted rehearing in banc.