**John W. SELCH, Plaintiff–Appellant,**

v.

**Christine W. LETTS, in her official capacity as the Director of the Indiana Department of Highways; Daniel A. Novreske, in his official capacity as the Chief Deputy Director of the Indiana Department of Highways; Robert D. Boxell, in his official capacity as the Chief of the Personnel Services Division of the Indiana Department of Highways; and Frederick Glass, in his official capacity as the Governor's Executive Assistant for Transportation, Defendants–Appellees.**

No. 92–2558.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1993.

Decided Sept. 21, 1993.

Peter G. Tamulonis (argued), John B. Drummy, Briane M. House, Kightlinger & Gray, Indianapolis, IN, for plaintiff-appellant.

David C. Campbell, Sharon L. Groeger (argued), Bingham, Summers, Welsh & Spil-man, Indianapolis, IN, for defendants-appellees.

Before CUMMINGS and KANNE, Circuit Judges, and EVANS, Chief District Judge.*

KANNE, Circuit Judge.

For some, the mention of the phrase "political patronage" may conjure up distasteful and unpleasant thoughts of party faithful being rewarded for an election victory with the "spoils" of government jobs. Nevertheless, the fact is the effective implementation of public policy sanctioned by the voters (and some say the survival of a viable two-party political system) depends on a newly elected administration placing politically loyal individuals in certain government positions. Of course, following the ouster of the "in party," the initial aspect of the implementation of political patronage typically results in the "creation of vacancies" in the government work force. In 1988, Indiana voters rejected the incumbent Republican administration and elected a Democratic governor. Thus, we are required in this appeal to decide whether John Selch's discharge from his position as an Indiana highway subdistrict superintendent, shortly after the new Democratic administration came into power, was a constitutionally proper exercise in the practice of political patronage.

## I.

Until 1989, through both Democratic and Republican administrations, the Indiana Department of Highways[1] operated under a patronage system which required signed political "clearance cards" for all Department employee hirings. Selch concedes that during a Republican administration in 1984 his status as a Republican loyalist enabled him to secure the position of Highway Engineering Assistant III with the Department. Later that year, he was promoted to Highway Maintenance Supervisor V, which increased

* The Honorable Terence T. Evans, Chief Judge of the Eastern District of Wisconsin, is sitting by designation.

1. Through legislation effective in 1989, other state transportation functions were merged with the old Indiana Department of Highways. The emerging entity was renamed the Indiana Department of Transportation. Hereafter, for ease of reference, we refer to the Indiana governmental unit dealing with highways simply as the "Department."

his responsibilities from the performance of quality inspections to the supervision of a road crew of ten to twelve workers. Finally, in 1986, the Highway Commissioner elevated Selch to the position of Superintendent of the Greencastle Subdistrict, one of 37 such geographic highway zones in Indiana.

By the fall of 1988, there began to emerge a real possibility that a Democrat would occupy the Indiana governor's mansion for the first time in twenty years. Fearful that a new administration would not appreciate his loyalty to the Republican party, Selch requested a demotion to what he believed was the "politically safe" position of unit foreman; his request was denied.

In November of 1988, possibility became reality—Democrat Evan Bayh was elected governor. Governor Bayh had campaigned on the need to increase the efficiency of government in general, including that of Indiana's highway maintenance, construction and repair operations. The Indiana State Employees' Association's endorsement of Bayh was based, in part, on his pledge to eliminate waste and mismanagement within the state highway operations.

In carrying out a legislatively enacted reorganization, Governor Bayh appointed Christine Letts to serve as the Director of the new Department of Transportation. In late January of 1989, with the Democratic administration in place, Selch sent a letter to Letts requesting that he be retained as the Greencastle subdistrict superintendent. However, membership in the Democratic Party had replaced membership in the Republican Party as an indispensable qualification for the position of subdistrict superintendent.[2] In late June 1989, receiving the same treatment as his 36 fellow Republican subdistrict superintendents, Selch was discharged from his position and replaced with a Democrat.

Less than a month later, Selch filed suit in state court. The case was then removed to the United States District Court for the Southern District of Indiana. His claim came under 42 U.S.C. § 1983. Seeking to recover his former position of subdistrict superintendent, Selch alleged that he was discharged on the basis of his political affiliation, in violation of his First Amendment rights to freedom of speech and association as guaranteed through the Fourteenth Amendment.

## II.

To succeed in his claim of improper dismissal or demotion based on constitutionally protected behavior, Selch had to prove that his status as a Republican was a motivating factor in the decision to discharge him from the position of subdistrict superintendent. *Nekolny v. Painter*, 653 F.2d 1164, 1167 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Upon that showing, the burden shifted to the defendants to demonstrate that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980).

Following a bench trial, the district court entered judgment in the defendants' favor, finding that although politics was a motivating factor in Selch's dismissal, political affiliation was a proper requirement for the position of subdistrict superintendent. 792 F.Supp. 1502. On appeal, the defendants do not challenge the district court's finding that the dismissal was politically motivated. However, Selch contends that the district court erred in holding that the position of subdistrict superintendent was one for which political affiliation was a constitutionally valid requirement.

## III.

The issue of whether political beliefs are a proper consideration for a particular government position originated in the 1970's case of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod*, the Supreme Court held that the decision of the sheriff of Cook County, Illinois, to discharge certain employees based on whether or not

2. As part of the restructuring, the "subdistrict superintendent" position was renamed "subdistrict manager." Because this change in title is of no significance in this appeal, we will simply refer to the position at issue as subdistrict superintendent.

they worked on his campaign violated their First Amendment rights of freedom of speech and association. Yet the Court also held that an exception to the constitutional prohibition on patronage employment practices exists when those rights are outweighed by the government's need for political loyalty in employees, as is the case in both policymaking *id.* at 367, 96 S.Ct. at 2687 (plurality opinion), and confidential positions. *Id.* at 374–75, 96 S.Ct. at 2690 (Stewart, J., concurring).

In *Branti,* the Supreme Court abandoned the exclusive use of these terms to describe the types of positions exempt from patronage restrictions:

> Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character.... It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position.... In sum, the ultimate inquiry is not whether the label "policymaking" or "confidential" fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

445 U.S. at 518, 100 S.Ct. at 1294–95. We have phrased the relevant inquiry as "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on the goals or their implementation." *Nekolny,* 653 F.2d at 1170.

The district court found *Nekolny's* reformulation of Supreme Court precedent of little assistance.

> At least in terms of Mr. Selch's communications with his superiors, it would be a stretch to say that his job entailed "meaningful input into government decision making." Except for the information he supplied in conjunction with the budgeting process, there was little evidence that he was relied upon to provide critical information or other "input" to the hierarchy of the highway department. Moreover, if the term "goals" is broadly construed, there

was little room for disagreement over Mr. Selch's goals. Broadly put, Mr. Selch's goal was simply to insure that the road construction and maintenance work in his subdistrict was effectively and speedily undertaken. (Citations omitted).

Nonetheless, the district court held that, in light of the significant amount of responsibility involved and the ability to "threaten the goals of the in-party," political affiliation was an appropriate requirement for the subdistrict superintendent position.

Selch argues on appeal that by focusing on those two factors, the district court's opinion conflicts with Supreme Court and Seventh Circuit precedent. Reviewing this question of law *de novo,* we find no error.

## IV.

■ In addressing the ultimate inquiry of whether political affiliation is an appropriate requirement for Selch's position, the district court appropriately took into account the amount of responsibility the subdistrict superintendent position entailed. The Supreme Court has recognized that political patronage addresses "the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2687 (plurality opinion). As an employee's level of responsibility increases, so does his ability to obstruct the implementation of policy. Persons who occupy positions subject to constitutional protection "usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Id.*

In *Elrod,* the Supreme Court found the nature of the responsibilities critical because "[e]mployee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives." 427 U.S. at 368–69, 96 S.Ct. at 2687. "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policy-

making position." *Id.* at 368, 96 S.Ct. at 2687. The greater the degree of discretion inherent in an employee's position the more difficult it becomes for the state to discharge the employee for insubordination, despite the fact that the employee's performance frustrates the implementation of the administration's policies.

Contrary to Selch's assertions on appeal, the district court not only inquired as to the degree of responsibility held by a subdistrict superintendent, but also examined the nature of that responsibility. The court found the wide discretion exercised by the subdistrict superintendent persuasive in concluding the position was exempt from First Amendment protection. Having found that the subdistrict superintendent possessed a substantial degree of responsibility that involved the exercise of discretion, the district court did not end its analysis. For while a great deal of responsibility and the ability to exercise discretion go a long way to show that the position is exempt from First Amendment protection, not all such positions require a loyal political affiliation. For example, few would dispute that the head football coach of a state university possesses substantial responsibility involving wide discretion, but "no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

■ Thus, the district court properly proceeded to examine whether an opposition party loyalist in the position in question could reasonably serve to threaten the policy goals of the party in power. This approach demonstrated a clear and insightful understanding of the law as it advanced the policy recognized by the exception to the constitutional restriction on patronage hiring— "elected officials cannot implement the policies that they were elected to carry out, and hence the will of the electorate cannot be effectuated, unless the officials can install their political allies in the most sensitive jobs." *Wilbur v. Mahan,* 3 F.3d 214, 217 (7th Cir.1993).

. V.

■ Concluding that the district court did not err as a matter of law, we turn to the issue of whether it correctly found that Selch's political affiliation could constitutionally be considered for the position of subdistrict superintendent. We review the court's finding under the clearly erroneous standard of Fed.R.Civ.P. 52(a) and will reverse only when "left with the definite and firm conviction that a mistake has been committed." *Tomczak v. City of Chicago,* 765 F.2d 633, 639 (7th Cir.) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). In making this inquiry, we examine the position's inherent powers, rather than those actually exercised by any one occupant. *Heck v. City of Freeport,* 985 F.2d 305, 309 (7th Cir.1993); *Tomczak,* 765 F.2d at 640–41.

■ Indiana is geographically divided into six regional highway districts, which are each in turn divided into several subdistricts. Subdistrict superintendents are located throughout the state and are the members of the Department's management organization primarily responsible for highway operations within defined geographic areas. Selch's responsibilities as subdistrict superintendent included the direction and coordination of all the maintenance activities relating to the over 800 miles of state highways within his subdistrict. For the Greencastle subdistrict, this required the management of over 60 employees and a $1,000,000 budget.

The management hierarchy of the Department descended from the state level at Indianapolis, to the regional district level, and finally to the local subdistrict. According to the official job description of subdistrict superintendent, Selch "overs[aw] the maintenance and repair program for state highways, buildings and grounds, and equipment in [the subdistrict]."

In particular, as the subdistrict superintendent, Selch was charged with:

—plan[ning the] annual workload and determin[ing] resource requirements based upon that plan;

—investigat[ing] and tak[ing] corrective action on complaints and information requests from the general public; [and]

—provid[ing] personal supervision, personnel, and equipment during emergencies, such as snow and ice removal, detours, accidents, and road repairs, etc.

To perform these responsibilities, a subdistrict superintendent must possess the:

—ability to plan, formulate, and carry-out programs, policies, and administrative matters;

—ability to develop program plans, guidelines, and polices to meet the needs of the sub-district operation; [and]

—ability to effectively communicate with district and subdistrict personnel, contractors, other governmental officials, and the general public.

Based on this description and other evidence presented at trial, the district court found that Selch possessed "almost unbridled authority to determine where and when, within his subdistrict work was to be done."

Selch contends the district court erred because the subdistrict superintendent's goal of maintaining the highways in his area of the state is not subject to principled disagreement based on partisan politics. According to Selch, partisan political considerations do not legitimately affect the order or manner in which potholes are filled. His view finds support in *Akers v. Caperton*, 998 F.2d 220 (4th Cir.1993), in which the Fourth Circuit held that a position similar to that formerly held by Selch was subject to First Amendment protection. *See also Abraham v. Pekarski*, 537 F.Supp. 858 (E.D.Pa.1982), *aff'd in part*, 728 F.2d 167 (3rd Cir.), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984).

We have previously rejected this narrow view of the role of politics in the implementation of policy. In *Tomczak*, the district court had held that political affiliation was not a proper consideration for the position of the First Deputy Commissioner in the City of Chicago's Water Department because the position only involved "mundane decisions concerning the repair and rehabilitation of the water systems and [did not entail] decision-making authority in areas in which there could be principled disagreements about goals or their implementation." 765 F.2d at 641. Recognizing political reality and thus the important role the implementation of policy plays in determining the success of an administration, we reversed the district court's decision:

[The district court's reasoning] is an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services. . . . Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.

*Id.*

Even though the position involved the implementation of policy, Selch argues that political affiliation is not an appropriate requirement for subdistrict superintendent because his discretion was cabined by general directives which came from upper level management.

General policies and guidelines were provided to the subdistrict superintendents through the Departmental Policies Manual and the Field Operations Manual. The Operations Manual set forth various work activities to be performed on the different elements of the state highway system that were located in each subdistrict. For example, the maintenance of bridges would include activities such as bridge repair, patching bridge decks, and hand cleaning bridges. A performance standard existed for each of these activities, which would describe how the work was to be performed and the amount of manpower and materials needed to complete the job.

The maintenance budget for each subdistrict set aside funds for each of the various maintenance activities to be performed throughout the year. The budget was based on historical data as well as input from the

subdistrict superintendents on the needs for the upcoming year.

The work was reported to the Department's central office through a "crew day card" system. The unit foremen, who reported to the subdistrict superintendent, received crew cards specifying the work to be completed during an eight hour period. Each card contained information regarding the number of men and materials needed to complete the task. The unit foremen assigned a crew of workers and equipment to each activity, and after the task was completed the cards were returned to the central office so that it could record the amount of resources expended. Some of these cards were issued directly from the central office, while others were left to the discretion of the district superintendent or the subdistrict superintendent.

The subdistrict superintendents received a monthly work calendar. For each month the Field Operations Manual described which activities and how many crew days of work should be scheduled. The subdistrict superintendent, with the assistance of his subordinates, then put together a semi-monthly work schedule, which was reviewed by the District Maintenance Engineer.

At trial, the parties presented conflicting testimony regarding the amount of discretion the subdistrict superintendent exercised under operational directives set forth as a part of the Department's Maintenance Management System. According to Selch, these policies and means of internal control restricted discretion at his management level to the point that he merely performed routine work at the direction of upper management.

On the other hand, Selch's replacement, William Sibbit, testified that the subdistrict superintendent position involved more than the mundane application of the maintenance guidelines. He referred to the Operations Manual only once every three or four months. Other testimony indicated that subdistrict superintendents decided where the road maintenance would be completed within the subdistrict.

In attempting to ascertain the powers inherent in the subdistrict superintendent position, the district court was entitled to credit the testimony of Sibbit and others over that of Selch. "[I]f an officeholder performs fewer or less important functions than usually attend to his position, he may still be exempt from the prohibition against political termination if his position inherently encompasses tasks that render his political affiliation an appropriate requirement for effective performance." *Tomczak*, 765 F.2d at 641.

Policymaking and policy implementation may occur at many levels, even within a particular office whose sphere of authority is narrowly circumscribed. *Nekolny*, 653 F.2d at 1169–70. While input into a policy decision may be limited, "in implementing [a] basic policy, [an employee] will 'make some decisions that will actually create policy.'" *Upton v. Thompson*, 930 F.2d 1209, 1215 (7th Cir.1991) (quoting *Livas v. Petka*, 711 F.2d 798, 801 (7th Cir.1983), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992)).

Here, although upper levels of management provided the subdistrict superintendent with guidelines for the execution of maintenance work, the effective implementation of road maintenance policy in diverse geographic areas entailed more than ensuring that maintenance procedures were completed. The subdistrict superintendent could decide where and when the work was to be completed. The way in which subdistrict superintendents located across the state of Indiana exercised this discretion could impact greatly the effectiveness of Department services.

There is significant evidence in political life that the failure to properly provide public services, such as snow removal from highways, will adversely impact on the chief executive of a state or local government charged with providing such services. *See Tomczak*, 765 F.2d at 641 ("Indeed, one of the biggest, if not the biggest, turning points in the 1979 Chicago mayoral election involved the provision of snow-removal services."). In the case before us, the successful implementation of policy in the area of highway maintenance would likely have substantial effect on the public's perception of the Democratic administration, especially given that the Department's performance was an issue in Governor Bayh's campaign.

The subdistrict superintendent's potential impact on the actual or perceived implementation of policy is most readily apparent in the area of investigating and taking corrective action on complaints and information requests. This includes the responsibility entailed in reacting to unforeseen emergency conditions that hinder travel. Subdistrict superintendents typically received fifteen to twenty phone calls per day from public officials and citizens, responding to which requires the exercise of decision-making authority and political sensitivity.

Consequently, even though the subdistrict superintendent falls at the lower end of the management hierarchy, Selch was a critical and highly visible representative of the state administration and was required to exercise discretion in meeting the needs of public officials and a large number of the electorate. While there is no indication that Selch would not effectively perform his duties, "[a]ctual disruption or disturbance need not be proved." *Wilbur, supra,* 3 F.3d at 218. "Once the employee is classified [as exempt from First Amendment protection], he can be fired on political grounds even if there is no evidence that he would not serve his political superiors loyally and competently." *Id.*

Indiana's new Democratic state administration was not required to recruit informants or engage in secret surveillance of the 37 subdistrict superintendents scattered throughout the entire state to ensure that they exercised their discretion to effectively implement policy, but rather the administration was entitled to fill those positions with individuals politically loyal to it. Consequently, the district court did not commit clear error in concluding that, based on his political affiliation, Selch could be discharged from his position of subdistrict superintendent without violating the Constitution.[3]

## VI.

When in *Elrod* the Supreme Court distilled from the First Amendment a directive that political affiliation could only be used as the basis in employment decisions when the government's interest outweighed that of the individual, it left to the discretion of federal judges the traditionally legislative question of which jobs may be subject to patronage employment practices. Not surprisingly, the inherently fact-specific standard has led to varied, if not conflicting, results. In *Branti,* Justice Powell recognized that "[t]he standard articulated by the Court is framed in vague and sweeping language certain to create vast uncertainty." 445 U.S. at 524, 100 S.Ct. at 1297 (Powell, J., dissenting). This prediction has come true, as evidenced by Justice Scalia's observation ten years later that *Branti* has produced a "shambles" of "inconsistent and unpredictable results." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 111–12, 110 S.Ct. 2729, 2756–57, 111 L.Ed.2d 52 (Scalia, J., dissenting). *See also Stott v. Haworth,* 916 F.2d 134, 144–45 (4th Cir.1990) (citing conflicting applications of the *Elrod–Branti* standard).

Given the state of the law regarding the issue of political patronage practices, the district court declared that it approached "the opportunity to apply the *Elrod–Branti* standard to a new set of facts with all the relish of a sojourner forced down a darkened alley on a moonless night." In our view, it completed the journey unscathed. The district court decision demonstrates a well-developed analysis of the law, and the record supports its finding that political affiliation may constitutionally serve as a requirement for the position of subdistrict superintendent. Accordingly, the district court's entry of judgment in favor of the defendants is AFFIRMED.

---

3. We note that our conclusion is supported by the Indiana General Assembly's classification of the position as exempt from its statutory prohibition of employment actions based on political affiliation. Ind.Code § 8–23–2–3(c) (West Supp. 1992). While not dispositive, the statutory classification, "as the considered description of the state legislature, ... is entitled to great weight." *Lohorn v. Michal,* 913 F.2d 327, 334 (7th Cir. 1990).