**Eugene F. ASSAF, Sr., Plaintiff,**

v.

**George C. FIELDS, Gary E. Crowell, Defendants.**

**Civil Action No. 1:CV–97–343.**

United States District Court, M.D. Pennsylvania.

Feb. 13, 1998.

Lawrence S. Markowitz, York, PA, for plaintiff.

R. Douglas Sherman, Attys. Gen. Office, Harrisburg, PA, for defendants.

### MEMORANDUM

CALDWELL, District Judge.

#### I. *Introduction.*

This case presents a *Branti–Elrod* claim. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The plaintiff, Eugene F. Assaf, Sr., alleges that his first amendment rights were violated when he was fired from his job with the Department of General Services for the Commonwealth of Pennsylvania on the basis of party affiliation. The plaintiff, a Democrat, lost his job shortly after Tom Ridge, a Republican, was elected Governor. The plaintiff seeks compensatory and punitive damages.

The defendants are Gary E. Crowell and George C. Fields. Crowell is the Secretary of the Department of General Services, and Fields was Deputy Secretary of Procurement in the Department and the plaintiff's immediate supervisor at the time of his discharge.

We are considering the defendants' motion for summary judgment under Fed.R.Civ.P. 56. The defendants deny that plaintiff was fired for political reasons but argue that, even if he was, political affiliation is a valid condition for the job. They also argue that, even if the first amendment protected his job, they are entitled to qualified immunity. As we read the cases, the main issue presented is whether the plaintiff's job allowed him to have input into the nature and scope of a major governmental program or to shape the public's perception of that program. If so, then he has no first amendment claim because these duties are so significant they entitle high-level officials to take into account political affiliation in filling the job.

We will evaluate the defendants' motion under the well established standard. *See Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 536 n. 3 (3d Cir. 1994). In doing so, we note that, while the parties emphasize different facts, there is no dispute as to the material ones. The case is therefore suitable for summary judgment, and we present the following background in the light most favorable to the plaintiff.

#### II. *Background.*

The plaintiff, a Democrat, was hired in October 1988 as Director of the Bureau of Vehicle Management while Robert P. Casey, also a Democrat, was governor. The Bureau is an agency within the Department of General Services and is responsible for some 8,000 cars that the Commonwealth owns for the transportation needs of various state agencies.

Republican Tom Ridge won the November 1994 election for governor over his Democratic opponent and was inaugurated in January 1995. In the same month, Governor Ridge chose Gary E. Crowell to be the Secretary of the Department of General Services. Immediately below Crowell, George Fields was the Department's Deputy Secre-

tary for Procurement, occupying that position from January 1990 until February 1996. As Director of the Bureau of Vehicle Management, plaintiff reported directly to Fields.

In March 1995, Fields fired the plaintiff. The plaintiff alleges that Fields admitted at that time that he was being terminated because of politics. The defendants deny this was the reason. Crowell asserts that he wanted to establish an atmosphere of customer service for state employees and members of the general public who did business with the Bureau and that, as he assessed plaintiff, he was lacking in those areas.

Assaf's job was exempt from civil service protection and was non-union. When he was hired in 1988, the Commonwealth's letter confirming his appointment informed him that his position was covered under the "Senior Management Service," a category of positions deemed to "have broad policy participation and management responsibility." (Assaf deposition, exhibit 3). As such, he served "at the pleasure of the agency head." (*Id.*). The letter also informed him he was ineligible for unemployment compensation.

The Bureau is formally divided into three sections, the Administrative Division, the Vehicle Operations Division, and the Vehicle Maintenance Division. As the Director of the Bureau, Assaf supervised these sections and a total of 33 to 46 employees He started at an annual salary of $37,000 and ended with a salary of $52,000. He ran the day-to-day operation of the Bureau.

In June 1990, the plaintiff received a written job description (which identified his position with the alternative title of "fleet maintenance manager"). His duties were listed in ten numbered paragraphs, but we can divide them into general and subsidiary duties as follows.

First, the plaintiff's "major duties" were:

Directs the Bureau of Vehicle Management to meet the transportation needs of all requesting Commonwealth Departments, Agencies, and Commissions while remaining within the financial guidelines of self-generated income.

(Assaf deposition, exhibit 5).

He then had three general duties:

Participates with the Deputy Secretary in planning, developing and implementing appropriate standards, procedures and policies for obtaining and maintaining the Commonwealth Automotive Fleet;

Directs the operation of the Commonwealth Garage concerned with the service and repair of the automotive fleet. Negotiates and administers regular maintenance contracts with service Agencies and with dealerships for repair and preventive maintenance;

Oversees the disposition of the Commonwealth owned vehicles. These vehicles are sold through an oral auction which is open to the public. Makes sure that all activities are carried out according to approved policy. Interacts with the general public whenever concerns arise.

(*Id.*, exhibit 5, ¶¶ s 1, 4 and 6).

Certain subsidiary duties are also specified: "stays abreast of the automobile market and recommends when to purchase vehicles....";  "determines the best type of vehicles to purchase"; "directs the maintenance of all records and reports concerning the Commonwealth Fleet"; "assures that all of the vehicles are properly licensed" and titled; "directs the payment of repair invoices from various vendors ..."; "oversees the repair of vehicles at the Commonwealth garage"; "directs the temporary vehicle fleet making it available for use by the requesting Commonwealth agencies...." (*Id.*) [1]

---

1. In August 1992, the plaintiff also acknowledged that his "essential job functions" included:

    1. Ability to plan, develop, and implement appropriate standards, procedures and policies for obtaining and maintaining the Commonwealth Automotive Fleet.

    2. Ability to properly utilize proper communication skills.

    3. Ability to motivate, discipline and instruct subordinates in a fair and impartial manner.

    4. Ability to learn and apply the principles of modern supervision.

    5. Ability to interview prospective employees.

    9. (sic) Ability to ensure all subordinates observe rules and regulations and strive to achieve Departmental objectives.

(*Id.*, exhibit 5).

Assaf actually discharged these duties as follows. Overall, the plaintiff ran the day-to-day operation of the Bureau, but Fields kept a "tight rein." Consequently, as to his three main responsibilities, Assaf had input but he could not make the ultimate decision; that was up to Fields.

Thus, as to obtaining new vehicles, and contrary to the job description, Assaf did not recommend when they should be purchased. The Bureau of Purchasing decided how many cars to buy and when to do so, conditioned on Fields' approval. Plaintiff's only input into the purchase decision was indirect because he decided when cars should be auctioned, and the income from the auctions partially determined how many cars could be purchased. According to Fields, Assaf used a "formula" to decide which cars to auction, although the formula was not a "strict" one.

Similarly, as to assigning vehicles to the various agencies, while Assaf made that decision, Fields had to approve it. Moreover, Fields had control over executive vehicle assignments.

Second, as to repairs and routine maintenance for Commonwealth vehicles, maintenance was done at the Commonwealth Garage according to manufacturers' warranties and changed by Assaf only when the manufacturer recommended a change. Assaf could approve outside repair shops to do work for the Commonwealth if they had certain capabilities. These shops could perform repair work if they accepted the standard contract from the Commonwealth, which Assaf did not draft. The rates they were paid could increase based on a formula tied to inflation. Assaf could change these rates and the changes were normally approved, but nonetheless the Deputy Secretary and the Secretary had authority to reject Assaf's decisions.

Third, as to the auction of Commonwealth vehicles, as noted above, a formula was used to select the cars for auction although some discretion was used, depending, among other things, on the maintenance history and the number of a particular make of vehicle in stock. Fields had to approve Assaf's list of cars to be auctioned. The target price that the Commonwealth sought for each vehicle was also set by a formula which could take into account the condition of the individual vehicle.

As to more general duties, Assaf had no final authority to hire or fire but could make recommendations about those matters. He could also discipline employees. He had no input into his budget. He could make certain contracts. He could not make capital improvements to the Commonwealth Garage. He did have meetings with the Deputy Secretary every two weeks along with the other Bureau Directors and occasionally alone. At one point during his tenure, he responded to criticism from a buyer at the auction by writing to Fields and asserting that "the new changes and policies I have established have made this auction respected throughout the State and outside the State." (Assaf deposition, exhibit 11). .

The defendants credit the plaintiff with a number of positive accomplishments. Assaf assesses them differently. Thus, the defendants assert that Assaf was "instrumental in changing Bureau policies and practices with respect to the auctioning of surplus State automobiles to increase security." Assaf says he locked a door to the auction stage while the auction was going on. The defendants contend that he established firm target prices on vehicles in a professional manner, increased revenue from the auctions, increased participation by the public bidding on the cars and installed good business practices. Assaf says the formula for pricing was already there and that he just generated a mailing list to notify the public of auctions. The defendants also assert that Assaf took steps to involve the State Attorney General's Office in investigating possible collusion by bidders at auction. Assaf says that he merely notified the Attorney General whose office successfully investigated the bidders. The defendants contend that Assaf changed the labor rates for repair work from a statewide rate to a countywide rate. Assaf says he just passed along a suggestion from an employee which Fields approved. The defendants assert that Assaf was involved in changing the way state agencies were charged for vehicle rentals by taking into account the type of car, among other things. Assaf says that a

formula had been in place for years about this and Fields actually made it work. Finally, the defendants contend that the plaintiff "represented" the Commonwealth at three conferences of the National Fleet Administrators. The plaintiff counters that he merely attended the conferences and reported on them.

After he was fired, the plaintiff applied for unemployment compensation. The Unemployment Compensation Board of Review rejected his application after applying state law that took into account the *Elrod* and *Branti* decisions.

At Crowell's deposition taken in connection with this case, the following exchange took place:

Q To do the job of director of vehicle management, do you think party affiliation is an appropriate requirement to effectively do that job?

A No. I do not.

(Crowell deposition at p. 61)

III. *Discussion.*

A. *Whether the Plaintiff Had First Amendment Protection For His Job.*

We must begin by deciding whether the plaintiff has a first amendment claim at all, and only then proceed to the issue of qualified immunity. *See In re City of Philadelphia Litigation,* 49 F.3d 945, 961 (3d Cir. 1995).

■ A state violates an employee's first amendment rights by discharging him on the basis of his political affiliation. *Peters v. Delaware River Port Authority,* 16 F.3d 1346 (3d Cir.1994) However, there is an exception when "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 1353.

■ In deciding whether it is, we must examine whether the worker has "meaningful input into decision making concerning the nature and scope of a major [government] program." *Id.* (brackets added in *Peters*) (quoted case and internal quotation marks omitted), or whether he "acts as an adviser or formulates plans for the implementation of broad goals," *id.* at 1352 (quoting *Elrod,* 427

U.S. at 368, 96 S.Ct. at 2687, 49 L.Ed.2d at 562), or whether she acts as a spokesperson communicating the policies of superior officials. *Brown v. Trench,* 787 F.2d 167 (3d Cir.1986).

■ Stated another way, if " 'a difference in party affiliation [is] highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office,' " *Waskovich v. Morgano,* 2 F.3d 1292, 1297 (3d Cir.1993) (brackets added) (quoting *Zold v. Township of Mantua,* 935 F.2d 633, 635 (3d Cir.1991)), or if a person's position made it possible to cause "political embarrassment" for higher officials, *id.,* he can be dismissed without violating the first amendment. *Id.*

To aid in this evaluation we examine the duties the employee actually performed. Thus, we look at the following factors:

whether the employee's duties were simply nondiscretionary or technical; whether the employee participated in discussions or meetings; whether the employee prepared budgets; whether the employee had the authority to hire or fire other employees; the employee's salary; whether the employee could control others and speak in the name of policymakers.

*See Waskovich,* 2 F.3d at 1297; *Peters,* 16 F.3d at 1353.

We must also look at the inherent functions of the office in question rather than the particular duties performed by the plaintiff because high-level officials should be able to structure the job as they wish rather than be limited by those who occupied the position in the past. *Waskovich,* at 1297–98; *Peters,* 16 F.3d at 1353; *Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981); *Zold supra,* 935 F.2d at 640.

"[E]ach decision is fact specific." *Peters,* 16 F.3d at 1353 (brackets added).

The troublesome questions arise at the margins. Courts have candidly acknowledged that "between the strictly menial government worker ... and the policymaker/confidential assistant ... there is a range of government positions for which the propriety of patronage firing has depended largely on the courts' juggling of competing constitutional and political val-

ues." *Upton v. Thompson,* 930 F.2d 1209, 1213 (7th Cir.1991), cert. denied, [503] U.S. [906], 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992) ...

*Waskovich,* 2 F.3d at 1297.

The Third Circuit has also stated that the classification of the job under state law is also a factor to be considered, *id.* at 1299 n. 7 (exemption from civil service protection is one factor among others to be considered), along with the amount of the position's salary. *Peters, supra,* 16 F.3d at 1358.

Because the plaintiff's position is supervisory or middle management, we also find *Rice v. Ohio Department of Transportation,* 14 F.3d 1133 (6th Cir.1994), relevant. In *Rice,* the Sixth Circuit, quoting Justice Brennan's opinion in *Elrod,* noted:

No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well-defined or are of broad scope more likely functions in a policymaking position.

*Id.* at 1139 (quoting *Elrod,* 427 U.S. at 367–68, 96 S.Ct. at 2687, 49 L.Ed.2d at 562).

We also note that courts outside the Third Circuit have found political affiliation appropriate when the employee was charged with implementing an important public policy even if his input on the policy was limited. *See Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258 (1st Cir.1987); *Selch v. Letts,* 5 F.3d 1040, 1046 (7th Cir.1993) (in implementing policy an employee may sometimes create policy). They have also exempted a position from first amendment protection when it was in the line of communication to high-level officials such that the officials had to rely on the person holding the job for information about an important public program. *See Rice, supra; Faughender v. City of North Olmsted,* 927 F.2d 909 (6th Cir.1991) (political affiliation appropriate consideration for job of mayor's secretary when she controlled the line of communication to the mayor).

Against this legal background, we proceed to the parties' arguments on summary judgment.

█ In moving for summary judgment, the defendants first argue that the plaintiff's claim should be rejected because he received the position as a result of political patronage and should not now be allowed to complain that he lost the job for the same reason. This argument has no merit because the Supreme Court rejected it in *Branti, supra,* 445 U.S. at 512 n. 6, 100 S.Ct. at 1292 n. 6, 63 L.Ed.2d at 580 n. 6.

█ The defendants next argue that the position of Director of the Bureau of Vehicle Management is the type of job for which political affiliation is an appropriate consideration. They rely on the following facts. First, Assaf was in charge of the Bureau and was only on the third level down in the hierarchy from the Secretary of the Commonwealth.

Second, the inherent function of the job as established in the job description conferred on Assaf the right to participate with the Deputy Secretary in planning, developing and implementing policies for his three main job duties: (1) the acquisition and maintenance of the Commonwealth's fleet of automobiles; (2) overseeing service and repair of the fleet; and (3) overseeing the public auction of vehicles. The defendants compare Assaf to the plaintiff in *Waskovich, supra.* In that case, the Third Circuit decided that a state employee who had input into policy decisions had no first amendment protection for his job based on party affiliation.

Third, the Commonwealth designated Assaf's job as a policymaking one and exempted it from civil service protection. Under *Waskovich,* this is a factor favoring the political nature of the job. Fourth, in a closely connected argument, the state determined that he was ineligible for unemployment compensation by ruling that he was a policymaker, and did so in light of federal law in this area.

Fifth, Assaf controlled the line of communication to his two superiors who had to depend on him to inform them of matters at the Bureau, so under *Faughender*, the job was political.

Sixth, the defendants rely on what Assaf actually did during his tenure. He represented the Commonwealth at conferences of the National Fleet Administrators. He had input into hiring and firing, could discipline workers, and, most importantly, he had boasted of the "policies" he had established. At the very least, he had input into policy-making decisions (so the fact that he needed approval from his superiors is unimportant). The defendants also contend that the amount of his annual salary, $52,000 in March 1995 when he was discharged, supports their position.

Finally, citing *Waskovich, supra*, the defendants contend that Assaf was in a position to embarrass them politically if he did not perform competently. They assert that the potential for "waste, financial impropriety and fraud" requires someone in the job who is politically in tune with them. As further support, they point to Crowell's goal of establishing an atmosphere of customer service and his desire to have workers advancing this goal.

In opposition, the plaintiff first argues that Crowell's admission when he was deposed that he did not think party affiliation was an appropriate requirement for the job is sufficient to defeat the motion for summary judgment and send the case to a jury. In the plaintiff's view, Crowell by his own admission has conceded the determinative issue in the case.

We do not agree. The question was couched in legal terms so Crowell's answer might have only meant that he thought political affiliation was not a necessity for doing the job. If so, the answer is relatively meaningless because the law requires only that political affiliation be an appropriate requirement for the job; not a necessity for the job itself. As the defendants point out, that Crowell thought that either a Democrat or Republican could do the job does not address the real issue, whether high-level officials could make political affiliation a qualification for the job.

In this regard, the case is similar to *Waskovich, supra*, where high-level officials stated that party affiliation was not a qualification for the job and that it would not be used to determine whether the plaintiff there would retain his job. On appeal, the plaintiff in *Waskovich* asserted that these statements were sufficient to take the case to trial and that the district court had erred in granting the defendants' motion for summary judgment. In the course of affirming the grant of summary judgment, the Third Circuit rejected this argument, noting that the officials had gone on to discuss the necessity of a subordinate official sharing the same political philosophy as his superiors. 2 F.3d at 1301–02. In the instant case, the defendants have likewise argued that a common political philosophy is important.

As also stated in *Waskovich*, 2 F.3d at 1302, quoting *Ness, supra*, 660 F.2d at 522: "while it is conceivable that a governor might employ speech writing assistants without regard to their political affiliation, we would not want to prevent governors in general from using political affiliation as a criterion for such positions." Similarly, in the instant case, while Crowell might find it conceivable that a Democrat or Republican could do the job, we would not want to prevent him from using political affiliation as a condition if he thought it was appropriate.

The plaintiff next argues that his job was not one where political affiliation could be made a requirement. First, he points out that in the three major areas of responsibility, he had very little discretion. Thus, in the purchase and assignment of autos, Assaf did not decide how many autos to purchase and his assignment of agency vehicles was subject to Fields' approval. Moreover, he had no authority in regard to executive cars. In regard to the auction, a formula was used to decide which cars would be sold and the target price for each one. In regard to repair and maintenance, he simply followed the manufacturers' service suggestions and contracted with outside vendors based on a standard contract (which he did not draft) with labor rates tied to inflation.

In regard to other job duties, Assaf did not control his own budget and could not hire or fire employees without Fields' approval. In fact, any significant thing Assaf did had to receive Fields "blessing," as Fields put it. In sum, plaintiff contends that he simply did not have duties broad enough that political affiliation could be considered for his job.

In reply, the defendants argue that plaintiff had input, if not complete control, over certain job duties so that his role as one who provided input into a major governmental program is sufficient to defeat his claim. Additionally, they assert that he is pursuing the same strategy that has failed for others in his position, simply pretending that he really did nothing at his job when the facts show otherwise.

After reviewing the parties' briefs, we conclude that the job of Director of the Bureau of Vehicle Management is not one in which party affiliation is an appropriate requirement. We reach this conclusion based on two reasons.

First, while a number of factors can be considered on this issue, the overarching factor is whether the worker has "meaningful input into decision making concerning the nature and scope of a major [government] program." *Peters, supra,* 16 F.3d at 1353. Thus, the employee must not only have input but the input must be into a major government program. Obviously, overseeing the cars owned by the Commonwealth and used by its agencies is a government program but, in our view, it is not a major government program, at least not in the sense the cases in this area have used that term.

A major government program would involve services to the general public or to a sizable portion of the public. In the Third Circuit, for example, in *Waskovich, supra,* the job at issue was Director of New Jersey's Division of Veterans' Administrative Services, an agency that primarily provided nursing home care to New Jersey veterans but which also had a part in deciding what other benefits might be made available to veterans. 2 F.3d at 1302 and n. 9. In *Peters, supra,* the job at issue was Secretary of the Delaware River Port Authority, an agency created by compact between Pennsylvania and New Jersey, charged with operating the bridges across the Delaware River between the two states, developing a port area, and operating an interstate rapid transit system. 16 F.3d at 1348. In *Brown, supra,* the job at issue was county assistant director of public information, responsible for presenting the views of the county commissioners to the public and for promoting county projects. 787 F.2d at 170.

Other circuits have dealt with similar government programs. In *Collazo Rivera, supra,* the job was regional director of the Puerto Rican Housing Authority, a government agency responsible for housing programs in rural areas. 812 F.2d at 260. In *Rice, supra,* the job was administrative assistant in a geographic district in Ohio responsible for maintaining the roads under the control of the Ohio Department of Transportation. 14 F.3d at 1137. In *Selch supra,* the job was superintendent of a subdistrict of the Indiana Department of Highways, responsible for maintaining roadways in that subdistrict. 5 F.3d at 1044.

In contrast, in the instant case, the plaintiff's job was with a government program that served state agencies, not the general public or a segment of it. Moreover, the program was limited to providing the agencies with a discrete service, transportation by state-owned automobiles. This does not qualify as a major government program.

We acknowledge that the defendants would assert that the Bureau does serve the public because it conducts auctions at which the public appears. But this is only a tiny segment of the public, who appear voluntarily for what is essentially a commercial transaction—the purchase of a car.

Additionally, mere contact with the public does not transform a person's job into a political one. The Third Circuit has held that a person whose job it is to explain policy to the public has no first amendment protection. *See Brown, supra.* However, in *Zold, supra,* the court stated that a person's job is not political simply because she informed the press of upcoming agendas for the Township and received and responded to citizen complaints. 935 F.2d at 638.

In the instant case, Assaf's job was akin to the one in *Zold*, not *Brown*. He did not promote policy. He attended conferences of the National Fleet Administrators but did not "represent" the Commonwealth at them in the sense of presenting its policies or views. He had contact with the public when he supervised the auctions, but again his role at these was not to promote policy.

Our second reason for concluding that party affiliation is not an appropriate requirement for the job is that the cases have stated that the worker must act as an adviser or formulate plans for the implementation of broad goals. *See Peters, supra*. Consistent with this emphasis on broad goals is the Sixth Circuit's statement in *Rice*, quoted above, that an employee supervisor who has many responsibilities may not be in a political job if those responsibilities have only limited and well-defined objectives. 14 F.3d at 1139.

In the instant case, there is no doubt that Assaf's job was a supervisory one. He ran the day-to-day operation of the Bureau. He had, at the very least, input into hiring and firing decisions. He also disciplined workers. However, as noted above, being a supervisor is not enough; he must have had input into broad goals, and his job responsibilities must have been broad in scope as well.

Assaf had no input into broad goals nor were his job responsibilities broad in scope. He had to do three main things in his job: (1) assist the Deputy Secretary in establishing procedures and policies for obtaining and maintaining the Commonwealth's fleet of cars; (2) insure that the cars were serviced and repaired properly; and (3) oversee the auctions.

None of these duties involve broad goals or responsibilities, and thus this case is easily distinguishable from *Waskovich*, upon which the defendants so heavily rely. In *Wasko-*

*vich*, the plaintiff had input into basic policy decisions concerning New Jersey veterans affairs and was authorized to speak about the agency's policies.

For the most part, the other factors we must consider do not assist the defendants either. We grant that certain factors are in their favor. Assaf's duties were not merely technical, he participated in meetings and he could control others. However, the remaining factors go against them. Assaf did not prepare budgets. He could not hire or fire other employees, although he had input into these decisions. Nor could he speak in the name of policymakers. (As noted above, handling customer complaints is not the equivalent.) [2]

■ Finally, the defendants have also argued that the job is political because it could be a source of political embarrassment to high officials in the Department. Citing *Waskovich*, they rely on the possibility that if the job was not performed properly, "waste, financial impropriety and fraud" (supporting brief at p. 12) could result and have negative consequences for the party in power.

*Waskovich* does not support this contention. *Waskovich* (and the cases it cited) mentioned differences in political philosophy as a potential cause of political embarrassment, not incompetence. 2 F.3d at 1302. In other words, if the position had enough discretion that the holder of the office could make political choices different from high-level officials, the office could be considered political. In contrast, ineffective job performance has nothing to do with political philosophy, is a danger no matter what the political affiliation of the person holding the job, and can be dealt with either way by firing the person.

■ That the job is not a political one is buttressed by the reasons Crowell gave for

---

**2.** Quite frankly, we do not know what to do with the salary factor. In *Peters*, the Third Circuit stated that salary was a factor to be considered and concluded there that in *Waskovich* a salary of $64,000 in July 1990, when the plaintiff was discharged, supported the political nature of the job and in *Peters*, a salary of $57,000 in January 1991 did the same. Assaf was making $52,000 in March 1995 when he was discharged. We do not know how we can compare the salaries over time, nor have the parties attempted to assist us in that regard.

However, if anything, the plaintiff's salary supports our conclusion that he did not hold a political job since it was about 9% less than what the plaintiff was earning in *Peters* about five years earlier.

discharging the plaintiff. Crowell asserted that he wanted the Bureau to emphasize customer service with both the public and employees of state agencies. He supposedly discharged Assaf because Crowell perceived him as not having the type of attitude consistent with that goal. Significantly, Crowell does not mention that he wanted to bring to the Bureau substantive changes in how it performed its mission, just a better attitude.

■ The defendants have also relied on the state law classifications of the plaintiff's job as a policymaking one, one exempt from civil service protection, and one where the occupant serves at the pleasure of the agency head. However, state law treatment of a job is just one factor to be considered, and it is outweighed by those discussed above.

■ Finally, we reject the defendants' reliance on *Faughender, supra,* to argue that political affiliation is an appropriate consideration for the job because the Director of the Bureau controlled the line of communication to the Deputy Secretary and the Secretary. In *Faughender,* the job at issue was secretary to the major, obviously a crucial position for the free flow of information to that official. In the instant case, on the other hand, Assaf only had to communicate to Fields about matters in the Bureau about which Fields would have had an ability to measure Assaf's performance. It may be only a matter of degree, but a distinction is proper here.

Since we have decided that the first amendment protected Assaf's job, we must now decide if the defendants have qualified immunity from the plaintiff's damage claim.

B. *Qualified Immunity.*

■ The Supreme Court has stated that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). Even where they violate clearly established rights, officials will nonetheless be immune from suit if they acted in a manner which they reasonably believe to be lawful. *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995).

For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). While the right need not have been held unlawful under factually identical circumstances, "in the light of pre-existing law the unlawfulness must be apparent." *Id.; Good v. Dauphin County Social Services for Children & Youth,* 891 F.2d 1087, 1092 (3d Cir.1989). A conclusion after the fact that the conduct is unlawful is insufficient, since government officials should not "be expected to anticipate subsequent legal developments." *In re City of Philadelphia, supra,* 49 F.3d at 961 (quoted case omitted).

The defendants argue that they are entitled to qualified immunity because officials in their positions could reasonably have believed that Assaf's job was a political one from which he could have been discharged on the basis of party affiliation. In support, they point out that every case presenting a *Branti–Elrod* claim is "fact specific," *Peters, supra,* 16 F.3d at 1353, that the case is close enough to *Waskovich* to have allowed the defendants to have relied on that case, and that at least some of the factors used to determine whether a job is political favored their decision to discharge Assaf. Specifically, they rely on the state's classification of the position, that it was supervisory and played a role in hiring, firing and discipline, that the job had contact with the Deputy Secretary and Secretary of the Department with (in their view) policy discussions.

In opposition, the plaintiff relies on the fact that it was well established before his discharge that a person could not be fired from certain positions on the basis of political affiliation and that Crowell knew this. Hence, if the first amendment protected his job, the defendants should be held liable.

We agree with the defendants that they are entitled to qualified immunity. Initially, we note that the plaintiff's opposition argu-

ment is totally inadequate. Of course, in the abstract the defendants could not fire someone from a job that was not political, but the test is whether the contours of the right were sufficiently clear that a reasonable official would have known that he could not have fired the plaintiff for political reasons. We do not believe that is true for the following reasons.

First, except for *Waskovich,* the existing Third Circuit precedent provided no guidance since it was factually distinguishable, as our discussion of *Peters, Zold* and *Brown* make clear. And *Waskovich* itself would have informed the defendants only of what was sufficient for finding that the job was political job, not what was necessary.

Second, the plaintiff's position could fairly be characterized as being in "middle management," below the actual policymakers but above a first-level employee. Other circuits have split about whether these types of supervisory positions are entitled to first amendment protection. *Compare Akers v. Caperton,* 998 F.2d 220 (4th Cir.1993) (county superintendents in West Virginia responsible for road maintenance and repair were not in a political job even though they implemented policy) *with Selch, supra,* 5 F.3d at 1045–1046 (disagreeing with Akers about a similar job in Indiana and treating implementation of policy just as important as creating it). The defendants could have thought that, even though plaintiff's input into policy was minimal, they still had to rely on him to implement it. *See also Collazo Rivera, supra,* 812 F.2d at 262 (reliance on a detailed guidebook does not render a job nonpolitical since implementation of policy is just as important as policymaking).

Finally, as we noted above, some factors did favor the defendants; Assaf's duties were not merely technical, he participated in meetings, and he could control others. Moreover, even on the ones that did not favor them the defendants could have reasonably believed that his input into them made his job political.

In conclusion, we accept the qualified immunity defense and we will issue an appropriate order.

*ORDER*

AND NOW, this 13th day of February, 1998, it is ordered that:

1. The defendants' motion for summary judgment (doc. 10) is granted.

2. The Clerk of Court shall enter judgment in favor of the defendants and against plaintiff and close this file.